UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SAGAN C.S. LARA,                                Civil No. 11-172 (DSD/FLN)
f/k/a LARA C. MOSHER,

                Plaintiff,

v.
                                                **REPORT AND**
MICHAEL J. ASTRUE,                              **RECOMMENDATION**
Commissioner of Social Security,

                Defendant.

_____

Edward C. Olson, for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendant.
_____

Plaintiff Sagan C.S. Lara ("Ms. Lara") seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner"), who denied her application for disability

insurance benefits. The matter was referred to the undersigned United States Magistrate Judge for

Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has

jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). The parties have submitted cross motions

for summary judgment. (ECF Nos. 14, 19.) For the reasons which follow, it is this Court's

recommendation that the Commissioner's decision be **REVERSED** and the case be **REMANDED**

to the Commissioner for the immediate calculation and award of benefits.

## I. INTRODUCTION

Ms. Lara filed an application for disability benefits on July 16, 2007, alleging disability as

of September 25, 2006. (Administrative Record [hereinafter "R."] 171, ECF No. 7.) The Social

Security Administration ("SSA") initially denied her application on October 12, 2007 (R. 68), and

again upon reconsideration on June 16, 2008.  (R. 85.)  A hearing was held on January 15, 2010 before Administrative Law Judge ("ALJ") Roger W. Thomas.  (R. 26-63.)  The ALJ determined that Ms. Lara was not disabled within the meaning of the Social Security Act from September 25, 2006 through March 17, 2010, the date of the decision.  (R. 10-21.)  The ALJ found that Ms. Lara had the residual functional capacity ("RFC") to perform her past relevant work as a data recovery coordinator.  (R. 21.)

On November 22, 2010, the Appeals Council denied Ms. Lara's request for review, rendering the ALJ's decision final for purposes of judicial review.  (R. 2-4.); *see* 20 C.F.R. § 404.981.  Ms. Lara commenced this civil action for review on January 24, 2011.  (ECF No. 1.)  The Commissioner filed his Answer on April 7, 2011.  (ECF No. 6.)  Ms. Lara and the Commissioner have both moved for summary judgment. (ECF Nos. 14, 19.)

## II.  STATEMENT OF FACTS

### A.     Background

Ms. Lara was 29  years old as of September 25, 2006, her alleged onset date of disability. (R. 143.)  Ms. Lara has a history of morbid obesity, prior to a gastric bypass surgery in 2004.  (R. 630, 494-496.)  Ms. Lara suffers from chronic back pain and a degenerative disc disorder.  (R. 25, 60, 197.)  She has completed four years of college, earning an associates degree and a bachelor of science degree.  (R. 182.)  She has past relevant work experience as a data recovery coordinator and a general office clerk.  (R. 245.)  Ms. Lara worked at Target Corporation for seven years prior to stopping work in September 2006 due to severe back pain.  (R. 175-176.)

### B.     Medical Evidence

Ms. Lara has a history of back pain that began before her alleged onset date of disability.

2

In October of 2005, Ms. Lara reported to her treating doctor, internist Deborah Mague, M.D., that she was experiencing worsening back pain with spasms and pain down her left leg. (R. 574.) Dr. Mague ordered an MRI of her lumbar spine. (R. 576.) The MRI revealed posterior disc herniation at L4-5, mild central stenosis, and degenerative disc changes. (R. 303.) Ms. Lara was then examined by Dr. Ensor Transfeldt of the Twin Cities Spine Center, who recommended surgery to relieve the left leg pain. (R. 599.) On October 20, 2005, Dr. Transfeldt completed a microdiscectomy at the L4-5 level. (R. 450-451.)

In May 2006, Ms. Lara returned to Dr. Transfeldt reporting severe low back pain for the past two weeks. (R. 423.) Dr. Transfeldt ordered another MRI to rule out recurrent disc herniation, but the MRI showed mostly unchanged results from the October MRI. (R. 423, 313.) In June 2006, Ms. Lara visited Dr. Paul Amundson for a pain and palliative care consultation. (R. 270.) Dr. Amundson recommended group based and relaxation services, physical therapy, acupuncture, and medication for pain management. (R. 275.) Dr. Miles Belgrade managed Ms. Lara's pain medication. (R. 285, 263.) Dr. Transfeldt performed a lumbar epidural injection in June 2006, and Ms. Lara reported "50% relief of symptoms at 30 minutes post procedure." (R. 258.)

Ms. Lara continued treatment with Dr. Mague for depression and anxiety, some of which was related to her chronic pain management. (R. 421, 417.) In October 2006, Ms. Lara requested a prescription for the use of a wheelchair. (R. 414.) Dr. Mague noted that she would need the input of Ms. Lara's physical therapist to establish a need for a wheelchair. (R. 415.) In November 2006 Ms. Lara reported her back pain was under good control in the last several weeks. (R. 410.) She also reported to Dr. Belgrade that she was "functioning with less pain-related disability" due to the use of medication, and was planning to return to work. (R. 263.) She stated that she hoped to find

an alternative work situation in the near future because her work was a "high stress kind of position." (R. 263.)   In December 2006, Ms. Lara reported that she was doing well when not working and her pain was improving, but in the past three weeks since her return to work she had experienced severe low back pain. (R. 404.)  She reported to her psychologist that her attempted return to work was unsuccessful due to a combination of stress and pain. (R. 262.)

In April 2007, Ms. Lara completed a pain management evaluation with Dr. Louis Saeger at the Midwest Spine Institute. (R. 327-331.)  Dr. Saeger reviewed her history and completed a physical exam. (R. 327.)  Dr. Saeger summarized her pain complaints as "axial low back pain associated with intermittent spasm and a lot of rather extreme hypersensitivity through that whole lumbar area." *Id.*  Dr. Saeger observed that her post operative MRI scan reveals annular tear with dehydration at L3-4, left-sided laminectomy changes and degenerative changes at L4-5, and a central herniation at L5-S1. *Id.*  Dr. Saeger opined that "all three of those levels or any combination of them could be contributing to persistent axial discogenic pain." *Id.*  Dr. Saeger noted that Ms. Lara's pain levels, by her report, were "highly significant and debilitating." (R. 329.)  With regard to her self reported symptoms, Dr. Saeger opined:

> I believe this is physiologic and not a malingering or supratentorial syndrome. While she does have anxiety and some situational depression, that is understandable under the circumstances.  Those dynamics, however, can contribute to diminished pain tolerance.  There is probably an interplay between the anxiety, the depression, and the central sensitization syndrom that results from chronic nociceptive activity in her axial spine.

*Id.*  Dr. Saeger noted that Ms. Lara had discontinued medication management with Dr. Belgrade, and he deferred future medication management to Dr. Mague. (R. 328, 330.)

In July 2007, Ms. Lara reported to Dr. Mague that her back pain was at its worst and that she was unable to sit for more than one hour without needing to lie down. (R. 368.)  She reported

4

needing a wheelchair to go out in the community.  (R. 367.)  She requested help in applying for

disability, and Dr. Mague stated that she would be referred for an occupational therapy evaluation

to determine her functional capacity. (R. 369-370.)  In August 2007, Ms. Lara reported that her pain

was "reasonably well controlled" despite a car trip to Iowa.  (R. 366.)  In September 2007, Dr.

Mague and Ms. Lara completed a form for disability as Ms. Lara "stated her limitations." (R. 540.)

In October 2007 Ms. Lara reported she had been more active, possibly too much so, for that past

month and planned to taper back in an attempt to control pain.  (R. 539.)

In October 2007, state agency reviewing physician Dan Larson, M.D., completed a physical

functional capacity assessment.  (R. 437-444.)  Dr. Larson opined that Ms. Lara could lift or carry

20 pounds occasionally and 10 pounds frequently.  (R. 438.)  He further opined that she could stand

or walk, with normal breaks, for a total of about six hours in an eight-hour workday and sit for the

same amount of time.  *Id.*

In November 2007, Ms. Lara reported to Dr. Mague that her pain flares were "less often" and

that she had recently traveled to Paris using a wheelchair for support. (R. 535.)  In December 2007,

Ms. Lara returned to Dr. Transfeldt to discuss her options.  (R. 612.)  Dr. Transfeldt noted that her

MRI showed moderately advanced three-level disc degeneration at the L3-4, L4-5, and L5-S1 levels,

but that there did not appear to be any significant nerve root impingement or compression.  *Id.*  Dr.

Transfeldt opined that surgery would not be a good option.  *Id.*

In January 2008, Ms. Lara returned to Dr. Saeger for bursa injections to treat hip pain from

bursitis.  (R. 517.)  Ms. Lara received a series of injections in her right and left hips from January

through March of 2008.  (R. 512-517.)  Ms. Lara reported a 75% improvement and better

functioning as a result of the injections.  (R. 511.)

In July 2008, Ms. Lara reported to Dr. Mague that she had pain every day but could cope most days. (R. 701.) She stated that her mood impacts her ability to cope, but that her depression was currently under control with medication. *Id.* Dr. Mague observed Ms. Lara "walking easily with cane [and] able to climb into car without evident discomfort." (R. 702.) In September 2008 Ms. Lara reported her pain was "better than it has been in a long time," but was still present daily. (R. 695.) She requested a form for disability parking for a five year duration. *Id.* In October 2008, Dr. Saeger recommended to Dr. Mague that Ms. Lara participate in a formal exercise/physical therapy program as part of her pain management. (R. 691.) He also recommended that Dr. Mague review her disability papers every quarter. *Id.* Dr. Mague stated that she discussed these issues frankly with Ms. Lara, but determined that the disability form was still accurate as Ms. Lara continued to report the same limitations of function. *Id.* Ms. Lara stated that she was unable to maintain a job or attend school due to pain, and expressed frustration at her inability to work or study. *Id.*

In June 2009, Ms. Lara was seen by Dr. Laden, one of Dr. Mague's partners, for her routine medication check. (R. 670.) Ms. Lara requested that a disability form be completed because Target, her previous employer, had switched its carrier for long term disability. (R. 671.) Dr. Laden informed her that she was not qualified to complete a work assessment. *Id.* Dr. Laden agreed to fax the previous assessment completed by Dr. Mague as her primary care provider, as Ms. Lara stated that her condition had not changed since that time. *Id.* In October 2009, Ms. Lara was seen by Dr. Mague and reported extreme discomfort in both seated and standing positions and that she preferred lying supine for the majority of her day. (R. 663.) She reported the pain was so bad she was "unable to shower or complete toileting without notable pain." *Id.*

6

In January 2010, Ms. Lara was referred for a physical performance test (PPT) at the Sister Kenney Sports and Physical Therapy Center. (R. 715-719.) The evaluator stated that Ms. Lara appeared to put forth full effort, and that based on the consistencies noted between the preliminary assessment and the performance of activities, as well as the exertion level, the test results were considered reliable. (R. 717.) The examination revealed major limitations and pain on active range of motion of the trunk, but her neck, arms, and legs had an active range of motion within normal limits. (R. 716.) Ms. Lara's arm strength was 5/5 and leg strength was 4/5 with increased back pain. *Id.* Her gait was "slow paced, stiff, guarded and antalgic" but improved slightly when using a cane. *Id.* Ms. Lara was able to lift and carry five pounds for 50 feet, push and pull 15 and 20 pounds respectively, and perform within functional limitations for sitting, standing, walking, stair climbing and balance. *Id.* She was unable to perform kneeling, squatting, unloaded repeated bending or overhead lifting. *Id.* Based on these findings, the evaluator concluded that Ms. Lara's "tested physical capacities fall below the Sedentary Work Level" and Ms. Lara was not feasible for competitive employment. (R. 717.) The evaluator found that Ms. Lara could sit up to two hours of an eight hour day and stand or walk less than one hour of an eight hour day. (R. 718.) Dr. Mague signed the R-33 form summarizing Ms. Lara's functional capacities as a result of this evaluation. (R. 719.)

### C.     Claimant's Testimony

At the administrative hearing on January 15, 2010, Ms. Lara testified regarding  her background and conditions. (R. 31-50.) Ms. Lara testified that she had an associate of arts degree and a bachelor of science in telecommunications management. (R. 34.) Ms. Lara worked for Target Corporation for seven years, achieving a position as an incident manager for data recovery. (R. 47.)

7

Ms. Lara testified that after she stopped working she tried to go to school on a part time basis but found that "undoable." (R. 35.)

She testified that she has severe pain flares roughly once every two weeks that cause her incapacitating pain and panic. (R. 33.) She testified that she also experiences muscular pain that wraps around her hips, bursitis that burns in her hip sockets, and radiating pains and numbness up and down her legs. (R. 36.) Ms. Lara testified that she drives no more than once per week, because she is afraid of having a pain flare while driving. (R. 33.) She testified that she has "significantly cut back" her social life, going to a movie once every three months rather than three or four times a week. (R. 34.)

Ms. Lara testified that walking for long distances causes extreme pain in her lower lumber area and spine. (R. 36.) She testified that she uses a wheelchair, which was prescribed by her doctor, for about an hour on a good or normal day, and all day on a bad day. (R. 36-37.) Ms. Lara also testified that her cat is a service animal. She testified that her cat can tell when she is going to have a pain flare and that he warns her to go lie down by meowing inconsolably. (R. 38.)

Ms. Lara testified that she separated from her spouse in January of 2008, and since that time had been living with two roommates. (R. 32.) Ms. Lara testified that she only bathes once a week due to extreme pain, whereas she used to bathe every day. (R. 40.) She testified that she is able to dress herself, but that she usually wears pajamas all day. *Id.* She testified that on good days she is able to get to the kitchen and prepare food for herself, but that she keeps protein bars by her bed for the one or two days per month that she has a "full flare." *Id.* She testified that these flares last anywhere from four or five hours to four days. (R. 41.)

Ms. Lara also completed a Social Security Administration Function Report in April 2008.

Ms. Lara reported that she showered one to two times per week due to pain, usually ate protein bars or microwave meals, and received help from three friends in caring for her cat. (R. 217-218.) She reported that when her back pain was not flaring she was able to do dishes, laundry, vacuum, and take out the trash, but that when her back pain was flaring she could not do any of those things and received help from friends. (R. 218.) She stated that she goes outside two to three times per week, and that she uses a power wheelchair. (R. 219.) She stated that any physical activity could cause an increase in her pain, and that sitting for more than two hours could cause extreme pain. (R. 221.)

### D.     Third-Party Statements

On April 27, 2008, Ms. Lara's friend, Julia Howard, completed a Social Security Administration Third Party Function Report. (R. 205.) Ms. Howard reported that "on a good day [Ms. Lara] can function for 3-5 hours." *Id.* She reported that Ms. Lara doesn't sleep through the night due to pain and often sleeps on the couch during the day. (R. 206.) She reported that Ms. Lara eats food that doesn't require much standing to prepare, such as frozen dinners, fresh fruit, and protein bars, whereas before Ms. Lara's back problems the two would often cook complicated meals. (R. 207.) She reported that Ms. Lara is able to do housework such as light cleaning, loading the dishwasher, and taking out the trash, but that she can only do one task and must rest before attempting another. *Id.* She reported that Ms. Lara cannot sit up in a normal chair for long and needs to be in a reclined position. (R. 210.)

### E.     Medical Expert's Testimony

Andrew Steiner, M.D., testified as the medical expert ("ME") at the administrative hearing. (R. 50.) Dr. Steiner noted that Ms. Lara has been treated for low back pain with lower extremity radiation. *Id.* He noted that she has been diagnosed with degenerative disc disease with changes

noted at three levels.  He noted that her disc herniation was treated with a microdiscectomy on October 20, 2005.  (R. 52.)  Prior to surgery Ms. Lara suffered a distinct loss of strength in the left and since that time her lower extremity strength has improved within normal range.  *Id.*  Dr. Steiner noted that Dr. Mague and an emergency department physician had found sensory loss in the left at L5, but that other examiners found no neurological loss.  *Id.*  He noted that she had also been treated for bilateral hip pain related to bursitis.  *Id.*  Dr. Steiner noted other diagnoses of obesity, status post gastric bypass procedure in 2001, asthma, chronic pain syndrome and depression.  *Id.*

Dr. Steiner testified that these impairments do not meet or equal a social security listing.  (R. 52-53.)  Specifically with regard to the degenerative disc disease, Dr. Steiner noted that the surgery was "at least technically successful and not associated with the degree of neurological change as called for by the listings."  (R. 52.)  With regard to functional limitations, Dr. Steiner testified that Ms. Lara should be limited to a sedentary residual functional capacity, with only occasional bending, twisting, stooping, kneeling, crawling, crouching and climbing.  (R. 53.)  He also stated that her asthma would preclude working in any environments with high concentrations of air pollutants.  *Id.*

The ALJ asked Dr. Steiner whether he agreed or disagreed with the limitations stated by Dr. Mague as a result of the physical performance test performed on January 8, 2010.  (R. 53.)  Dr. Steiner described that evaluation as a "short term" functional capacity evaluation.  Dr. Steiner acknowledged that the limitations in that evaluation would place Ms. Lara at a less than sedentary residual functional capacity "based on the reports of pain and fatigue."  *Id.*  Dr. Steiner stated that there was "a fair amount of credibility considerations . . . with that testing."  *Id.*

Ms. Lara's attorney asked Dr. Steiner whether there was any indication in the record of Ms. Lara exaggerating her pain complaints or malingering.  Dr. Steiner replied that in his opinion there

were things indicating "hypersensitivity or symptom magnification." (R. 54.) When asked whether there was any indication in the record that such symptom magnification or hypersensitivity is a conscious effort, Dr. Steiner replied, "No." (R. 54.)

### F.    Vocational Expert's Testimony

Mr. David Russell testified at the administrative hearing as a vocational expert. (R. 54.) Mr. Russell testified that there was no specific title in the Dictionary of Occupational Titles ("DOT") for Ms. Lara's past relevant work. (R. 56.) Mr. Russell testified that her past job was most like the data recovery coordinator job which the DOT classifies as "light" because it is not unusual for a data recovery coordinator to be on his or her feet swapping out hardware. *Id.* Mr. Russell questioned Ms. Lara about her prior work, and she testified that once at work she was sitting and did not do work with hardware such as swapping hard drives. *Id.* Based on that testimony, Mr. Russell testified that Ms. Lara's past work as a data recovery coordinator was performed at a sedentary level. (R. 56-57.)

The ALJ asked Mr. Russell to consider an individual with Ms. Lara's age, past work, and impairments as described by the medical expert. (R. 57.) The ALJ stated that this individual is limited to sedentary work, no more than two hours out of eight on her feet, with no more than occasional bending, twisting, stooping, kneeling, crouching, or climbing. The hypothetical individual was also limited to a work environment with no high concentrations of air pollutants. *Id.* Mr. Russell testified that a person with these hypothetical limitations could perform Ms. Lara's past work as a data recovery coordinator. *Id.*

The ALJ also posed a hypothetical in which he asked Mr. Russell to include the limitations from the physical performance test performed on January 8, 2010. (R. 58.) The ALJ described

those limitations as lifting five pounds or less, carrying it up to fifty feet, pushing fifteen pounds,

pulling twenty pounds, grip between sixty and seventy pounds. *Id.* The ALJ also stated that this

included sitting six out of eight hours and standing and walking no more than two hours per day.[1]

*Id.* Mr. Russell stated that although the five pound lifting limit by definition is below the sedentary

level, the data recovery coordinator job could be performed within those limits as it only requires

the handling of paper. (R. 59.) Mr. Russell further testified that if the limits of sitting no more than

two hours and standing and walking less than one hour of an eight hour day were applied, those

limitations would preclude competitive employment. *Id.*

**G.     The ALJ's Decision**

To determine whether Ms. Lara was disabled, the ALJ followed the five-step sequential

process established by the Social Security Administration, outlined at 20 C.F.R. § 404.1520. At the

first step of the analysis, the ALJ determined that Ms. Lara had not engaged in substantial gainful

activity per 20 C.F.R. § 404.1520(b) since the alleged onset date of her disability. (R. 12.)

The second step in the sequential evaluation is to determine whether the claimant had a

severe impairment, defined as a medically determinable impairment or combination of impairments

that significantly limits the individual's physical or mental ability to meet the basic demands of work

activity. 20 C.F.R. § 404.1520(c). The ALJ found that Ms. Lara had the following severe

impairments: "a history of morbid obesity, status post gastric bypass surgery in 2004; degenerative

---

[1]The ALJ notes that the Physical Performance Test Summary mentions "sitting is required
approximately six out of eight, standing and walking should generally be no more than two." (R.
58.) These restrictions are listed in the Physical Performance Test Summary as part of the
definition of the Sedentary Work Level. (R. 717.) The Summary goes on to state that Ms.
Lara's physical capacity falls below the Sedentary Work Level and that she should be limited to
no more than one to two hours of sitting and less than one hour of standing or walking. (R. 718.)

disc disease of the lumbar spine, status post microdiscectomy in 2005; bilateral trochanteric bursitis; chronic pain; and a history of asthma."  (R. 12.)  The ALJ found that Ms. Lara's medically determinable mental impairments of depression and anxiety do not cause more than minimal limitation in Ms. Lara's ability to perform basic mental work activities and are therefore non-severe. (R. 12-13.)

The third step in the analysis requires a comparison of the claimant's severe impairments with the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, Listing of Impairments.  The ALJ concluded that Ms. Lara's impairments, alone or in combination, did not meet the medical equivalent of severity for any of the listed impairments.  (R. 14.)

At the fourth and fifth steps in the evaluative process, the ALJ must determine whether the claimant  has a residual functional capacity ("RFC") that allows her to perform her past relevant work, or any other jobs that exist in significant numbers in the national economy.  20 C.F.R. § 404.1565.  The ALJ concluded that Ms. Lara had the RFC to "perform sedentary work as defined in 20 C.F.R. § 404.1567(a) as lifting and carrying 10 pounds occasionally and 5 pounds frequently, standing and/or walking 2 hours of an 8 hour day, and sitting 6 hours of an 8 hour day, limited to no more than occasional bending, twisting, stooping, kneeling, crawling, crouching and climbing, and avoiding high concentrations of air pollutants."  (R. 14.)

In reaching this determination, the ALJ found that Ms. Lara's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," however Ms. Lara's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 15.) The ALJ placed "significant weight" on the opinion of the impartial medical expert, given

"his opportunity to review the entire record including the claimant's testimony, his medical expertise, and his familiarity with the Regulations." (R. 20.)  He also placed significant weight on "any opinions of the claimant's treating sources that are supported by objective findings." (R. 20.)

The ALJ rejected Dr. Mague's opinions of September 2007 and October 2008, because he found they were not consistent with Ms. Lara's overall functioning. (R. 20.)  The ALJ observed that in August 2007 Ms. Lara made a car trip to Iowa to attend her mother's funeral. *Id.*  He also noted that she was involved in school and completed a successful trip to Paris. *Id.*  The ALJ further noted that in October 2008, when Ms. Lara reported to Dr. Mague that she could not maintain a job because she could not sit, stand, or walk regularly, she was living independently and engaging in a wide range of household chores. *Id.*  The ALJ further noted that in 2009, Dr. Mague's partner Dr. Laden stated that she was not qualified to complete a work assessment. *Id.*  Based on their similar specialties in internal medicine, the ALJ questioned whether Dr. Mague was qualified to complete prior work assessments. *Id.*  Finally, the ALJ noted that it was unclear from the records whether Ms. Lara's wheelchair was necessary and medically prescribed. *Id.*

With regard to the PPT of January 2010, the ALJ relied on the medical expert's testimony that this was considered a short-term functional capacity evaluation based on current symptoms of pain and fatigue. (R. 20.)  The ALJ found that given the evidence that Ms. Lara had an overall functional capacity that was inconsistent with a finding of disability in 2007 and 2008, the PPT may be inconsistent with her level of functioning prior to January 2010.  The ALJ therefore found that Ms. Lara had failed to establish a 12-month durational requirement of disability based on the January 2010 PPT. *Id.*

Finally, the ALJ found that Ms. Lara was capable of performing her past relevant work as

a data recovery coordinator as actually performed. (R. 21.) The ALJ based this determination on the VE's testimony that an individual of Ms. Lara's age, education, and work history with the RFC set forth above could perform Ms. Lara's past work as a data recovery coordinator as she had performed it. *Id.* The ALJ held that Ms. Lara was not disabled, as defined in the Social Security Act, from September 25, 2006 through the date of his decision. *Id.*

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the

case differently. *Roberts v. Apfel*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV.  CONCLUSIONS OF LAW

Ms. Lara challenges the ALJ's determination at the fourth step of the analysis. Ms. Lara argues that the ALJ's determination of her residual functional capacity is not based upon substantial evidence. Specifically, Ms. Lara argues that the ALJ failed to give the proper weight to the opinion of her treating physician.

### A.  Applicable Law

Disability is defined as "the inability to do *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (emphasis added). In making a disability determination, the ALJ must analyze a sequential evaluation process which applies to both physical and mental disorders. Title 20, Section 404.1520 of the Code of Federal Regulations outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled. 20 C.F.R. § 404.1520.

The disability determination requires a step-by-step analysis. *See* 20 C.F.R. § 404.1520(a).

At the first step, the ALJ must consider the claimant's work history. 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the ALJ must consider the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or equal one of the listings in Appendix 1 to Subpart P of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of the claimant's RFC and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

**B. The ALJ Failed to Properly Evaluate and Weigh the Opinions of Ms. Lara's Treating Physician**

In his RFC assessment, the ALJ placed significant weight on the opinion of the impartial medical expert, Dr. Steiner, who neither treated nor examined Ms. Lara. (R. 20.) By contrast, the ALJ rejected the opinion of Dr. Mague, Ms. Lara's treating physician, that Ms. Lara was disabled in 2007 and 2008. *Id.* The ALJ appears to accept Dr. Mague's opinion that Ms. Lara was disabled in 2010, based on the results of the Physical Performance Test that found she had a less than sedentary RFC. *Id.* However, the ALJ found that Dr. Mague's opinions from 2007 and 2008 were inconsistent with other evidence of her functional capacity during that time. *Id.*

The opinion of a treating physician is accorded special deference under the social security regulations. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Generally, an ALJ is obliged to

17

give controlling weight to a treating physician's medical opinion if it is found that such opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).  The regulations provide that, the longer and more frequent the contact between the treating source, the greater the weight will be given to the opinion. See 20 C.F.R. § 404.1527(d)(2)(i); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir.2003). "When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(d)(2)(i). When the ALJ instead grants a treating physician's opinion little weight, the regulations provide that the ALJ must "always give good reasons." 20 C.F.R. § 404.1527(d)(2). The Eighth Circuit has upheld the ALJ's discounting of the medical opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997), or where a treating physician issues inconsistent opinions that undermine the credibility of such opinions. *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir.1996). In addition, "the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998); *Shontos*, 328 F.3d at 427. An ALJ may nevertheless credit medical evaluations of a consulting physician over that of the treating physician when such other assessments "are supported by better or more thorough medical evidence." *Rogers*, 118 F.3d at 602.

Here, the ALJ was faced with opinions from two physicians, Dr. Mague and Dr. Steiner. There is no question that Dr. Mague had the type of treatment relationship with Ms. Lara that would usually entitle his opinion to be granted controlling weight.  Dr. Mague was Ms. Lara's primary care

physician.  The record contains treatment notes from Dr. Mague's visits with Ms. Lara from 2005 through 2010, and during much of that time Dr. Mague saw Ms. Lara on a monthly basis.  (R. 362-433, 520-628.)  Dr. Mague was also in contact with Ms. Lara's other treating physicians, including Dr. Saeger who saw Ms. Lara for pain management and Dr. Transfeldt who completed her spine surgery.  (R. 691, 423, 598.)

Dr. Steiner, the medical expert, never treated or examined Ms. Lara, but based his opinion on the review of her medical records.  Dr. Steiner himself testified that his opinion was not based on any records or tests that were not available to Dr. Mague, therefore his opinion is not based on "better or more thorough medical evidence."  *Rogers*, 118 F.3d at 602.  Neither does the ALJ find that Dr. Mague offered inconsistent opinions that undermine the credibility of such opinions. Therefore, the ALJ could only discount Dr. Mague's opinion if he found it to be "inconsistent with other substantial evidence in the case record."  20 C.F.R. § 404.1527(d)(2).

The ALJ found that Dr. Mague's opinion that Ms. Lara was disabled in 2007 and 2008 was inconsistent with other evidence of her level of functioning.  Ms. Lara argues that the evidence relied upon by the ALJ as inconsistent with Dr. Mague's opinion does not constitute "substantial evidence" and this Court agrees.  The ALJ points to function reports completed by Ms. Lara and a friend in April 2008 as evidence that Ms. Lara was not disabled at that time.  (R. 20.)  He notes that she was living independently and engaging in a wide range of household chores.  *Id.*  However, upon reading those function reports, it becomes clear that Ms. Lara's daily activities during that period were severely limited.  Ms. Lara reported that she showered one to two times per week due to pain, usually ate protein bars or microwave meals, and received help from three friends in caring for her cat.  (R. 217-218.)  She reported that when her back pain was not flaring she was able to do dishes,

19

laundry, vacuum, and take out the trash, but that when her back pain was flaring she could not do any of those things and received help from friends. (R. 218.) Ms. Lara's friend Ms. Howard filled out a function report that similarly showed that Ms. Lara's daily activities were significantly limited due to pain. (R. 205-212.) She reported that Ms. Lara eats food that does not require much standing to prepare, such as frozen dinners, fruit, and protein bars. (R. 207.) She further testified that Ms. Lara was able to do housework such as light cleaning and loading the dishwasher, but that she was only able to do one task at a time before needing to rest before completing another. (R. 210.)

The Eighth Circuit has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995). The minimal daily activities reported by Ms. Lara and her friend are of the sort the Eighth Circuit has found repeatedly not to be inconsistent with disability. These function reports do not constitute substantial evidence that is inconsistent with Dr. Mague's opinion.

The ALJ also noted that Dr. Laden, Dr. Mague's partner, stated that she was not qualified to complete a work assessment in 2009. (R. 20, 671.) The ALJ found that because Dr. Laden and Dr. Mague both specialized in internal medicine, this raised a question as to whether Dr. Mague was qualified to complete prior work assessments. (R. 20.) However, when Dr. Laden's statement is read in the context of the entire treatment note for that date, it is clear that Dr. Laden stated that she was not qualified to provide such an assessment because she was not Ms. Lara's primary care provider. Dr. Laden submitted a work assessment previously completed by Dr. Mague, noting that it was completed by her primary care provider, and stated, "Please let them know your primary MD

20

is on leave until 10/09.  If assessment needed sooner, I would advise a referral to Sister Kenny Institute for workability assessment." (R. 673.)  Dr. Laden did not opine that she was not qualified to complete a work assessment due to her specialty in internal medicine, but rather because she was not Ms. Lara's primary care provider.

Finally, the ALJ points to evidence that in the fall of 2007 Ms. Lara was able to complete a car trip to Iowa and a trip to Paris as evidence that she was not disabled.  (R. 20.)  In August 2007, Ms. Lara traveled to Iowa for her mother's funeral, and reported that the long car trip exacerbated her pain and disrupted her sleep.  (R. 365-366.)  In November 2007, Ms. Lara reported to Dr. Mague that she had successfully traveled to Paris using a wheelchair for support.  (R. 535.)  She reported that she required more narcotic pain medication than usual during the trip.  *Id.*  While these two events may provide some evidence that Ms. Lara had a higher level of functioning than that found by Dr. Mague, the Court finds that they do not constitute substantial evidence in light of the record as a whole.

Plaintiff points out that Dr. Mague's opinion was also based on objective evidence in the record of abnormalities in Ms. Lara's spine.  An MRI of Ms. Lara's spine revealed three-level disc degeneration.  (R. 256, 312, 327.)  Dr. Saeger, another treating physician with whom Dr. Mague consulted regarding Ms. Lara's care, opined in 2007 that "all three of those levels or any combination of them could be contributing to persistent axial discogenic pain." (R. 327.)  He also opined that the "highly significant and disabling pain" reported by Ms. Lara was "physiologic and not a malingering or supratentorial syndrome." *Id.*  In light of the entire record, the Court finds that there is not substantial evidence in the record that is inconsistent with Dr. Mague's opinion of Ms. Lara's level of functioning during 2007 and 2008.

Dr. Mague had a long-term treatment relationship with Ms. Lara, and the Court finds that her opinions are both consistent with and supported by substantial evidence in the record. The record does not support giving Dr. Mague's opinion less weight than that of Dr. Steiner who never treated or examined Ms. Lara. The ALJ erred by failing to grant controlling weight to Dr. Mague's opinion, and therefore improperly calculated Ms. Lara's RFC.

### C.     Hypothetical Question Presented to the VE

Ms. Lara argues that because the ALJ improperly calculated her RFC, the testimony of the VE relied upon by the ALJ does not constitute substantial evidence upon which to base a denial of Ms. Lara's claim for benefits.

Testimony from a vocational expert, which was based on a properly phrased hypothetical question, constitutes substantial evidence supporting the ALJ's decision. *Id.* "However, where an ALJ improperly rejects the opinion of a treating physician . . . the vocational expert's testimony that jobs exist for the claimant does not constitute substantial evidence on the record as a whole where the vocational expert's testimony does not reflect the improperly rejected evidence." *Wiekamp v. Apfel*, 116 F.Supp.2d 1056, 1074 (N.D.Iowa 2000) (citing *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir.2000).

Here, the hypothetical posed to the VE relied on the ALJ's determination of Ms. Lara's RFC, which this Court has found improperly excluded the opinion of Ms. Lara's treating physician. Therefore, because the hypothetical questions posed to the vocational expert were based upon a faulty determination of Ms. Lara's RFC, the vocational expert's opinion that Ms. Lara could return to her past relevant work cannot constitute sufficient evidence that plaintiff was able to perform her past relevant work. *See Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir.1998); *see also Jenkins v. Apfel*,

196 F.2d 922, 925 (8th Cir.1999) (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion).

Ms. Lara's attorney also posed a hypothetical to the VE. He asked the VE whether Ms. Lara would be eligible for competitive employment if all the restrictions from the January 10, 2008, PPT, including the two hour sitting restriction and one hour walking and standing restrictions, were included in the hypothetical. (R. 59.) The ALJ himself stated that he accepted that under the social security rulings, that level of functioning would be considered disabled. (R. 59.) In his opinion, the ALJ appears to have accepted that Ms. Lara had the level of functioning stated by the PPT results in January 2010, but rejected Dr. Mague's opinion that Ms. Lara had that same level of functioning in 2007 and 2008. (R. 20.) However, when Dr. Mague's opinion is given controlling weight, the regulations support a finding that Ms. Lara was disabled, as the ALJ himself acknowledged at the hearing. The Court therefore recommends that Plaintiff's motion for summary judgment be granted, and the case remanded for a calculation and award of benefits. *See Andler v. Chater*, 100 F.3d 1389, 1394 (8th Cir. 1996) (if claimant is disabled on the record, court may reverse and remand for entry of order granting benefits).

## V.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (ECF No. 14) be **GRANTED**;

2.    Defendant's Motion for Summary Judgment (ECF No. 19) be **DENIED**;

3.    The Commissioner's decision be **REVERSED** and the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for the immediate calculation and award of benefits; and

4.      The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: February 13, 2012              *s/ Franklin L. Noel*
                                     FRANKLIN L. NOEL
                                     United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 27, 2012**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.